UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X    Index No.
INA BRATHWAITE

                              Plaintiff,

                                                                        **VERIFIED COMPLAINT**

    -against-

BANK OF AMERICA

                              Defendant.
------------------------------------------------------------------X

       Plaintiff INA BRATHWAITE, by her attorneys, The Legal Aid Society, Brooklyn Office for the Aging, as and for her complaint against Defendant BANK OF AMERICA ("BOA"), alleges as follows:

## THE PARTIES

1. Plaintiff INA BRATHWAITE, is a 76 year old widow who resides at 407 Park Place, Brooklyn, New York.

2. Defendant BOA is a national banking association with branches all around the New York metropolitan area, including a branch at 243 Flatbush Avenue, Brooklyn, New York.

## JURISDICTION AND VENUE

3. This action arises under the Electronic Funds Transfer Act, 15 USC §1693 et. seq., and the rules and regulations thereunder (the "EFTA"). Title 15 USC § 1693m(g) provides that civil actions brought under the EFTA may be commenced in any United States District Court without regard to the amount in controversy. BOA does business at its branch located at 243 Flatbush Avenue, Street, Brooklyn, in the Eastern District of New York. Accordingly, venue is proper in this district pursuant to 28 USC § 1391(c).

## LEGAL FRAMEWORK

4. The Electronic Funds Transfer Act is intended to protect individual consumers engaging in electronic fund transfers. See § 1693 (b) ("The primary objective of this subchapter … is the provision of individual consumer rights.")

5. An "unauthorized electronic fund transfer" is defined in the EFTA as "an electronic fund transfer from a consumer's account initiated by a person other than the consumer without actual authority to initiate such transfer and from which the consumer receives no benefit", § 1693a(11), except for an electronic transfer "(A) initiated by a person other than the consumer who was furnished with the card, code, or other means of access to such consumer's account by such consumer, unless the consumer has notified the financial institution involved that transfers by such other person are no longer authorized, (B) initiated with fraudulent intent by the consumer or any person acting in concert with the consumer, or (C) which constitutes an error committed by a financial institution." Id.

6. A financial institution is required to investigate consumers' claims of error, determine whether an error has occurred, and report or mail the results of such investigation and determination to the consumer within ten days. 15 USC § 1693f(a).

7. If a bank decides to deny a claim of error, it must explain its findings and provide the customer with copies of the documents it relied upon in its investigation to conclude that an error did not occur. 15 USC § 1693f(d); 12 CFR § 205.11.

8. Should a bank fail to comply with its obligations under EFTA, consumers are entitled to recover their actual damages, § 1693m(a)(1), plus an additional sum of from $100 to $1000 for each violation by the bank o § 1693m(a)(2)(A), plus the costs of the action and a reasonable

attorney's fee, § 1693m(a)(3). Treble damages may also be awarded if the court finds that a financial institution "did not have a reasonable basis for believing that the consumer's account is not in error." §1693f(e).

9. The federal regulations promulgated pursuant to EFTA § 1693b are found in Part 205 of Subchapter A of Chapter II of Title 12 of the Code of Federal Regulations and are known as "Regulation E". See 12 CFR § 205.1(a). The stated purpose of these federal regulations is to carry out the purposes of the EFTA, the primary objective of which "is the protection of individual consumers engaging in electronic fund transfers." 12 CFR § 205.1(b).

10. Official Staff Interpretations of the regulations are in Supplement 1 to Part 205 of the EFTA's implementing regulations. That Supplement provides that alleged "consumer negligence" in the handling of a debit card or PIN is not a basis for imposing liability on the consumer in excess of the limits provided for in the statute. (Comment 6(b) to Section 205.6) of Regulation E.)

## PRELIMINARY STATEMENT

11. Plaintiff brings this action for damages arising out of BOA's violations of the EFTA.

12. In or about 2009 Plaintiff opened several bank accounts with BOA at the branch located at 266 Broadway, Brooklyn, NY. These included a checking account, a money market savings account and a certificate of deposit account.

13. Plaintiff received from BOA a debit card and PIN number that allowed for withdrawals to be made at the bank's ATM machines located throughout the city. The only use plaintiff ever made of her debit card, however, was to withdraw funds at a teller's window at the branch located at 274 7th Avenue, Brooklyn.

14. Plaintiff at no time made withdrawals from her BOA accounts using her debit card at an ATM.

15. Plaintiff's daughter, Phyllis Brathwaite, made deposits of Plaintiff's monthly pension check of some $1,330 into the money market savings account. Such deposits were made at BOA's ATM located at 243 Flatbush Ave. Brooklyn. On occasion, Plaintiff would have her daughter make small withdrawals from Plaintiff's BOA checking account.

16. On each such occasion Plaintiff would give her BOA debit card and PIN number to Phyllis who would promptly return the card to her after each such transaction.

17. No person other than Phyllis, on the occasions cited above, ever had authorized possession of Plaintiff's debit card and PIN number. Plaintiff never authorized any other person to make an ATM withdrawal from her bank accounts at BOA.

18. In 2015, Plaintiff received a workman's compensation payment of $101,318.12 in connection with a personal injury she had suffered. On October 1, 2015, Plaintiff personally deposited those funds into her money market savings account at the BOA branch located at 274 7th Avenue, Brooklyn. This transaction was done at the teller's window.

19. Plaintiff did not make it a practice of reviewing monthly statements from BOA. Her husband was the one who handled the accounts. Plaintiff's husband, however, died in 2015.

20. In early July, 2016, Plaintiff did have occasion to look at her bank statement for the prior month and saw that withdrawals of some $860 had been made from her money market savings account - withdrawals that she had not authorized or even knew about.

21. Plaintiff promptly called BOA and brought these unauthorized withdrawals to the bank's attention. BOA stated it would look into the matter. It then issued Plaintiff a new debit card and advised her to destroy her old one.

22. On July 6, 2016, BOA, credited Plaintiff's account in the amount of $500. It failed, however, to give Plaintiff any explanation of the reason for this credit. On July 22, 2016, BOA, again without explanation, reversed this credit and debited the account for $500.

23. Plaintiff received no information from BOA in or after July, 2016, concerning any investigation it allegedly made to determine whether withdrawals from Plaintiff's account were authorized or unauthorized. No documents relating to the bank's alleged investigation were ever provided to Plaintiff.

24. In January, 2018, Plaintiff was making plans to travel to England to visit an ailing brother. In order to see if she had the funds to make such a trip she and her daughter, Phyllis, checked her BOA bank statements.

25. Phyllis was shocked to see that large withdrawals had been made from her mother's money market savings account from a BOA ATM at 243 Flatbush Avenue in the period December 22, 2017 through January 24, 2018. She brought these withdrawals, totaling some $4,200, to her mother's attention.

26. Plaintiff reviewed the statements and determined that she had neither made the withdrawals nor had she given authority to any other person to make them on her behalf. Similarly, neither Phyllis nor Plaintiff's other daughter, Vanessa Brathwaite, had made or had any knowledge of these withdrawals.

27. At the end of January, 2018, Plaintiff called BOA to report these unauthorized withdrawals. She was put in touch with a bank employee who reviewed with her on the telephone BOA bank statements for approximately the prior year and one half. Together they saw unauthorized withdrawals in that time period totaling $28,040.

28. At that point, Plaintiff informed BOA that she was making a claim on BOA for approximately $28,040 which was later adjusted to $28,540.

29. On February 7, 2018, BOA wrote Plaintiff a letter stating that it had "completed" its "review" of Plaintiff's claim and had determined that "no error has occurred." It stated in its letter that it considered the "disputed transaction closed."

30. BOA went on, in its letter of February 7th, to state under the heading "What you need to know", that its "records" showed that "the transaction activity in question was authorized and posted correctly to your account."

31. Thereafter, BOA informed Plaintiff that it made a second review of Plaintiff's claim. On February 23, 2018, it wrote Plaintiff another letter stating that its original decision was correct, that Mrs. Brathwaite would receive no credit to her account and that the bank, again, considered the "dispute closed."

32. In its two denial letters BOA stated that Plaintiff was entitled to receive copies of the documents the bank had relied upon in reaching its decision. This was a correct statement of the law. BOA nevertheless thereafter failed and refused to make any such documents available to Plaintiff.

33. BOA informed Plaintiff that it had videotape footage of the withdrawals at the ATM at 243 Flatbush Avenue which showed they had been made by a "heavyset black female with braids." The bank asserted that the person who made these withdrawals was Plaintiff's daughter.

34. The description BOA gave of the person who made the withdrawals did not match either of Plaintiff's daughters. Indeed, if a daughter had made unauthorized withdrawals from

her mother's account it is highly unlikely that she would have brought them to her mother's attention.

35. Plaintiff informed BOA that both she and her daughters wanted to view video footage of the withdrawals. She was told that BOA would schedule a time and place for them to do so.

36. Plaintiff waited for months for BOA to contact her about viewing this video footage. It never did so.

37. On May 14, 2018, Michael Larson, Esq., an attorney acting on behalf of Plaintiff, sent a letter to BOA's Legal Dept. and Customer Service office, to its Dispute Resolution office and to its Legal Order Processing Dept. asking that $28,540 in unauthorized withdrawals be credited to Plaintiff's account.

38. Attorney Larson also asked that the bank preserve its video footage of the withdrawals in issue and that it make that footage available to Plaintiff for her inspection.

39. BOA responded to attorney Larson's request to see the video tape by stating in a letter to counsel dated May 21, 2018, that counsel was required to serve a subpoena within 15 days "for the records to be preserved beyond our standard retention period."

40. This requirement for a subpoena that BOA insisted had to be served before the tapes would be made available to Plaintiff was a clear violation of the EFTA. The statute gives a customer an absolute right to review any and all documents the bank considered in its investigation of a customer's claim. As a matter of law, no subpoena is required.

41. Inasmuch as no court proceeding was even pending at the time BOA imposed this requirement, attorney Larson had no power to issue such a subpoena. BOA apparently assumed

that even without a pending lawsuit attorneys are free to issue subpoenas whenever they want to examine bank documents.

42. Attorney Larson was required to commence an action in New York State Supreme Court on behalf of by Plaintiff Brathwaite against a "John Doe" in order to obtain a legal basis for issuing a subpoena.

43. Accordingly, on May 22, 2018, Plaintiff filed a "John Doe" action in Supreme Court, King's County. On the same day, counsel served a Subpoena Duces Tecum on BOA calling for production of the video tapes by June 20, 2018.

44. BOA responded to the subpoena by stating in a letter dated May 24, 2018, that the documents would be produced on June 19, 2018.

45. On June 5, 2018, however, two weeks prior to the required production date, BOA wrote attorney Larson a letter stating that it was "unable to locate any information or records" that had been subpoenaed. The date of the records, according to the bank, "exceeds the Bank's retention period."

46. On July 13, 2018, BOA wrote Plaintiff another letter stating that it had "completed an additional review" of her claim, that it was crediting plaintiff's account in the amount of $500 and that it, again, "considered this dispute closed."

47. BOA did not explain how it was able to conduct an "additional review" of Plaintiff's account when a month earlier, according to BOA, it had been "unable to locate any information or records" relating to the disputed withdrawals.

48. Nor did BOA explain why it was giving Plaintiff a credit of $500 while at the same time rejecting Plaintiff's claim of over $28,540.

49. On September 10, 2018, Attorney Larson issued a second Subpoena Duces Tecum to BOA, returnable September 25, 2018, calling, once again, for the production of the video footage of the withdrawals from Plaintiff's accounts.

50. On September 20, 2018, BOA responded by letter to that subpoena. It claimed that notwithstanding the fact that it had allegedly made a "review" of those documents two months earlier, it was, once again, "unable to locate any accounts or records requested with the information provided."

51. The claim that the bank was "unable to locate" the video tapes was, again, a violation of the bank's obligation under the EFTA to retain and provide Plaintiff with copies of all documents it had relied upon in rejecting Plaintiff's claim.

52. On February 5, 2019, BOA, apparently responding to an inquiry from the Consumer Financial Protection Bureau, wrote a letter to Mrs. Brathwaite stating that it had reviewed the video surveillance tapes and concluded that "your daughter appears to be the individual associated with the disputed transactions." It once more rejected any claim for reimbursement.

53. BOA stated in this letter that the video tapes that it was previously "unable to locate" – or, alternatively, that it had destroyed as exceeding the "Bank's retention period" - had now been sent to the Flatbush Avenue Financial Center where they would be available "for your review."

54. Again, no explanation was given as to how tapes that had supposedly been destroyed could now be made available for Plaintiff's review.

55. In July, 2019, Plaintiff made an appointment at the Flatbush Avenue Financial Center of BOA for July 18, 2019 for herself and her daughters to view the videotapes.

56. When Plaintiff and her daughters showed up at the Financial Center that day the manager with whom they had been directed to speak informed them that he neither had the tapes nor any information concerning them. He stated that the person who allegedly sent the videotapes to the branch was no longer employed by BOA.

57. In a subsequent review of her bank statements Plaintiff determined that the total amount of the unauthorized withdrawals from her money market savings account that had been made after the deposit of $101,318.12 in October, 2015, amounted to $42,140.

58. Plaintiff's claim that funds had been illegally withdrawn from her account by unauthorized persons could have been easily and quickly resolved had BOA complied with its obligations under the EFTA and made the videotapes of the disputed withdrawals available for Plaintiff's review.

59. Such a review would have shown if the person who made the withdrawals was in fact Ms. Brathwaite's daughter as the bank claimed.

60. Instead of complying with its obligations under the EFTA, however, BOA engaged in pattern of obstruction and evasion for the purpose of preventing Plaintiff from viewing evidence upon which BOA supposedly relied.

## FIRST CLAIM FOR RELIEF

61. Plaintiff repeats and realleges paragraphs 1 through 60, above, as though fully set forth in this claim for relief.

62. In July, 2016, and again in January, 2018, Plaintiff reported to BOA that there had been numerous unauthorized withdrawals made from Plaintiff's account through an ATM machine located at 243 Flatbush Avenue, Brooklyn.

63. BOA denied both claims – stating that its alleged investigation established that Plaintiff's daughter had made the withdrawals and that they were therefore authorized.

64. As stated above, Mrs. Brathwaite's daughters bear no resemblance to the description the bank gave of the person who made the withdrawals. Moreover, both daughters have unequivocally stated, and will further do so under oath and penalty of perjury at trial, that they never made any of the withdrawals in dispute.

65. The EFTA places the burden of proof upon BOA to prove that the withdrawals from Plaintiff's account were authorized. Should BOA fail to meet this burden of proof, it must be held liable for the unauthorized withdrawals.

66. BOA, in violation of the statute and the regulations thereunder, repeatedly refused to turn over to Plaintiff and her attorney the videotapes of the withdrawals which, BOA claim, would prove that the withdrawals were authorized.

67. Instead of doing so, BOA claimed, alternatively, it was 1) "unable to locate" these documents or 2), that it had destroyed them under its "record retention" policy _after_ they had allegedly been reviewed in connection with an ongoing customer complaint.

68. BOA, having destroyed this evidence, cannot meet its burden of proof to show that the withdrawals about which Plaintiff complains were authorized.

69. Accordingly, Plaintiff is entitled as a matter of law to recover from BOA the full amount of the unauthorized withdrawals from Plaintiff's account that occurred in the period October, 2015 to February, 2018, plus treble damages, attorney's fees and costs of litigation.

## SECOND CLAIM FOR RELIEF

70. Plaintiffs repeat and reallege paragraphs 1 through 69, above, as though fully set forth in this claim for relief.

71. As alleged in above, on some nine occasions BOA rejected requests to turn over the video tapes and other documents upon which it had relied in rejecting Plaintiff's claims.

72. Under EFTA, each such rejection of Plaintiff's right to access constituted a separate violation of law. The statute provides that Plaintiff is entitled to recover damages of not less than $100 or more than $1,000 per violation. 15 USC §1693m(a).

73. EFTA further provides that a successful plaintiff is entitled to recover treble damages, reasonable attorney's fees as determined by the court and the costs of the action.

74. Accordingly, in addition to her actual damages described above, Plaintiff seeks statutory damages of $1,000 per violation for a total of $9,000.

WHEREFORE, Plaintiff demands judgment against BOA as follows:

    (a) On her First Claim for Relief the sum of $42,540, trebled,

    (b) On her Second Claim for Relief the sum of $9,000

    (c) Reasonable attorney's fees.

    (d) Costs and disbursements of this action, and

    (e) Such other relief as may be just, equitable and proper.

*[signature: Roger J. Hawke]*

ROGER J. HAWKE, Esq.
Volunteer Attorney
The Legal Aid Society
Brooklyn Office For The Aging
JANET E. SABEL Esq.
Attorney-in-Chief
ALEXANDER RYLEY, Esq.
Director of Elder Law
The Legal Aid Society
111 Livingston Street, 7th floor
Brooklyn, New York 11201
718-645-3111

Attorneys for Plaintiff Ina Brathwaite

Dated: Brooklyn, New York
October 29, 2019

## VERIFICATION

STATE OF NEW YORK )
) ss.:
COUNTY OF KINGS )

INA BRATHWAITE, being duly sworn, deposes and says:

1. I am the plaintiff in the within proceeding.

2. I have read the foregoing Verified Complaint and know the contents thereof. The same is true to my knowledge except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

*Ina Brathwaite*
INA BRATHWAITE

Sworn to before me this
22 day of October, 2019

_____
NOTARY PUBLIC

PATRICK LANGHENRY
Notary Public, State of New York
No. 02LA6003413
Qualified in Queens County
Commission Expires April 27, 20__